

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

NB:MEF/RAS
F. #2018R00823

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

March 23, 2023

By ECF

The Honorable Frederic Block
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Jonathan Deutsch
               Criminal Docket No. 18-502 (S-1) (FB)

Dear Judge Block:

      The government respectfully submits this letter in anticipation of defendant Jonathan Deutsch's sentencing, scheduled for March 30, 2023, at 3:00 p.m. On June 14, 2022, the defendant, a former New York city schoolteacher, was convicted after trial of four counts of sexually exploiting a minor and six counts of attempting to sexually exploit a minor, in violation of Title 18, United States Code, Sections 2251(a) and (e). These charges pertained to four distinct victims, three of whom testified at trial. As proven at trial, in 2016 and 2017, the defendant—who as a teacher should have been protecting, caring for and developing children—was instead compulsively using Facebook, under several aliases, to identify, contact, and groom vulnerable minors from all over the United States to create bespoke sexually explicit images and videos of themselves, for him, so that he could realize his pedophilic sexual fantasies within the comfort of his Brooklyn home.

      As set forth in the Presentence Investigation Report ("PSR"), dated December 27, 2022, as well as the addendum to the PSR (the "PSR Addendum"), dated January 6, 2023, the defendant's total offense level under the United States Sentencing Guidelines ("U.S.S.G." or "the Guidelines") is 50. PSR Addendum at ¶ 72. Because the total offense level under the Guidelines is capped at 43, that is the effective total offense level. Id. at ¶ 74 (citing U.S.S.G. Chapter 5, Part A (comment n.2)). Given an offense level of 43 and a Criminal History Category of I, the advisory Guidelines sentencing range is life. PSR at ¶ 109.

      For the reasons set forth below, the government respectfully submits that, after considering the factors set forth in 18 U.S.C. § 3553(a) ("Section 3553(a)"), in particular, the seriousness of the offense, and the history and characteristics of the defendant, the Court should sentence the defendant to a term of custody of 35 years, followed by an extended term

of supervised release. Such a term is sufficient but not greater than necessary, for this particular defendant, and consistent with recent sentences in comparable cases within this district.

    I.    Background

The evidence adduced at trial consisted of the testimony of three of the four victims identified in the counts of conviction, the testimony of multiple law enforcement officers, thousands of pages of Facebook communications between the defendant and his victims, photos retrieved from the defendant's computer that the defendant used on Facebook when communicating with minors and more than a dozen sexually explicit photographs and videos of his minor victims, which were created especially for the defendant. The evidence established that in 2016 and 2017, the defendant—who was employed as a schoolteacher at the time—engaged in a pattern of grooming particularly vulnerable children, some as young as 10-years-old, to manipulate them into creating sexually explicit images for the defendant's own sexual gratification. PSR at ¶¶ 16-20.

    A.    The Investigation

As set forth in the PSR, the investigation was initiated by the New York City Police Department ("NYPD") after they received a "Priority Level 1" notification report from the National Center for Missing and Exploited Children ("NCMEC") Cyber Tipline, informing the NYPD that Facebook had identified a 33-year old adult male (the defendant) who was enticing multiple children to send and produce, via social media accounts, pornographic content. Id. at ¶ 14. On or about November 28, 2017, the Honorable Jonathan Hecht of the Supreme Court of the State of New York authorized a search warrant that allowed police officers of the NYPD to search the records of Facebook for property associated with accounts under the names "Sam Morgan" (hereinafter, the "Sam Morgan Facebook Account") and "Jay Stern" (hereinafter, the "Jay Stern Facebook Account"), among others (the "Facebook Search Warrant"). Id. at ¶¶ 15-16.

On December 22, 2017, the NYPD executed a search warrant at the defendant's Brooklyn home, at which point they recovered a computer belonging to the defendant, which had been used to access the Facebook accounts searched pursuant to the Facebook Search Warrant. Id. at ¶ 16. Upon executing the search warrant, the defendant was placed under arrest. Id. Thereafter, given the nature and scope of the defendant's criminal conduct, which touched victims on a national level, as well as the volume of evidence, the investigation was turned over to the Federal Bureau of Investigation ("FBI") and the New York State case was dismissed in favor of federal prosecution.

    B.    The Offense Conduct

As established at trial and set forth in the PSR, the defendant used the Sam Morgan and Jay Stern Facebook Accounts to persuade, induce and entice minors to send him images and videos of themselves in which they were nude and engaged in sexually explicit conduct. Id. When using the Sam Morgan Account, the defendant posed as a 14-year-old

2

boy, and shared photos of an innocent looking teenager, who at times donned a floral wreath. When using the Jay Stern Account, the defendant posed as a 33-year-old teacher from Brooklyn, which was much closer to his own identity, but he used photographs of other men.

The evidence at trial established that the defendant used both accounts to target particularly vulnerable children, including children who were struggling with their sexuality and gender identity. See, e.g., Trial Transcript ("Tr.") at 84:5-18; see also PSR at ¶ 16. These children were particularly in need of support and acceptance and were therefore easier to draw in and manipulate. And the defendant, who was a teacher, had no trouble identifying particularly vulnerable teens who were, as a result, relatively more susceptible to his grooming efforts. The defendant joined Facebook groups and ran searches that would lead him to just this type of child, including searches for LGBTQ+ children, emo teens and transgender teens. GX 1A.1.[1] Some examples of Facebook groups the defendant joined include "Lesbian, Gay, bi, Trans+ Teens (13-19)," "LGBT Group 12-19," "Sluts 13-16," and "Naughty Teens."

Once the defendant connected with a potentially vulnerable child, he groomed them to engage in sexually explicit conduct for his own sexual gratification. The defendant expressed fake love, support and affection, developing their trust and convincing some victims that he was actually their boyfriend. See, e.g., Tr. at 160:20-24. The defendant drew his victims into extremely graphic, and at times violent, sexual conversations, thereby desensitizing them to his advances and normalizing the concept of sexual relationships between children and adults. And, once the defendant had gained their trust, the defendant asked these children to create and send sexually explicit photographs and videos of themselves.

i. ▮

Between November 2016 and February 2017, the defendant used the Jay Stern Facebook Account, in which he described himself as a 33-year-old teacher, to contact a 13-year-old girl named ▮ PSR at ¶ 17. After ▮ ignored the defendant's initial advances for days, the defendant wrote, "please? im not trying to annoy you or anything like that…but the truth is, im interested…I keep seeing your posts about how guys are shitty and im just trying to prove that im not one of those guys…I just want to get to know you." GX 1B-002. Initially, ▮ was uncomfortable speaking with the adult defendant. Tr. at 85:3-5. However, ▮ was struggling with her gender identity at the time and the defendant took advantage of her insecurities and lulled ▮ into a false sense of security by making her feel accepted. Tr. at 84:5-85:12; PSR at ¶ 17.

The defendant chatted online with ▮ for months before requesting nude photographs from her. See GX 1B. The defendant groomed ▮ using flattery, telling her that she was "beyond gorgeous," that she was "cool as hell, fun to talk to . . . and hot," and that there was a "small part of [him] that[ was] start[ing] to fall in love." GX 1B-002, -018, -051. After ▮ informed the defendant that she identified as transgender, the

---

[1] "GX" refers to government trial exhibits.

3

defendant responded, "doesnt change how i feel." GX 1B-054-55. And after ▇ said that she was "depressed" because her ex-partner had killed himself, the defendant said that he wanted to "cheer [her] up" because "…all i wanna do is make you happy." (GX 1B-064-65). The defendant regularly turned the conversation sexual, asking 13-year-old ▇ about her "fantasies, fetishes [and] kinks," asking if she "like[d] leather, and asking in graphic detail about her sexual history. GX 1B-021, -026, -032, -062, -066-69. The defendant worked to desensitize ▇ writing things like, "this might sound weird...but i get real turned on seeing young, like 11-15, girls smoking, doing real hard drugs...i dont know what it is, but its so f***ing hot." GX 1B-097. Then, on January 13, 2017, the defendant repeatedly asked ▇ for a sexy picture and his months of grooming paid off. In response to the defendant's steady drum beat of requests, ▇ sent three images of her bare chest and one image of her vagina. GX 1B-078-83. The defendant, hardly surprised or disappointed, responded, "looks delicious." GX 1B-083.

      ii.  ▇

Between December 2016 and February 2017, the defendant used the Jay Stern Facebook Account to communicate with ▇ who was 16 years old. PSR ¶ at 18. Like he did with ▇ the defendant groomed ▇ using flattery, writing, "youre cute as hell" and "im nuts about you," asking if she would "date" him, and telling ▇ he would "love her no matter what." GX 1C-003, -011, -021, -040. ▇ testified that she thought she was in love with the defendant and that when he told her he had a crush on her and dreamed of kissing her, she was "over the moon with excitement" because she thought someone actually liked her. Tr. 136:2-6; 141:23-142:4. She further testified that when the defendant told her that "he loved her no matter what," "she felt special because he said he loved" her. Tr. 142:1-4. ▇ even told the defendant that she was "scared she would grow attached" and the defendant responded, "That's okay. I'm nuts about you." Tr. at 145:13-17.

During the course of their conversations, the defendant told ▇ that he was a teacher, and he even asked her, "if I was a teacher in your school, would you still be interested in me?" GX 1C-018. At one point, ▇ even sent the defendant a picture of her geometry homework, asking for help. GX 1C-274 -275. Beyond his desire to be sexually attractive to students, the defendant disclosed that he had a fetish for daddy-daughter pornography ("i like the ddlg [daddy daughter little girl] thing, cause ive got a daughter fetish"), leather, and urine. GX 1C-024; see also Tr. at 136:2-4; GX 1C-028, -029. Related to this, the defendant told ▇ that his "biggest fantasy is to get my daughter pregnant." GX 1C-042. These statements are evidence not only of the defendant's pedophilia but also of his efforts to normalize extreme sexual behavior and fetishes, thereby encouraging his victims to engage in sexually exploitative behavior, even if not as extreme as the kind in which he was interested.

On January 6, 2017, after a highly sexual conversation, ▇ sent the defendant three images of her bare vagina. GX 1D.1-1D.3; Tr. at 149:20-150:17. ▇ asked for pictures of the defendant, and he said that he would send one if he "get[s] to see

more of [her]." GX 1C-066-67; Tr. 150:18-152:15. ▮ then sent a video of herself masturbating in which her vagina is exposed. GX 1D.4; GX 1C-070; Tr. at 153:2-153:19. As part of the same conversation, the defendant sent an image of an adult penis, which he represented was his own. GX 1C-068; Tr. at 151:9-22.

On January 17, 2017, after a sexually explicit conversation regarding urinating on and inside of each other and drinking each other's urine, the defendant asked ▮ for a video of herself urinating in a cup and then drinking it ("but i wanna see the pee coming out, into the cup, and then you drinking it"), and in response to her question, he told ▮ that she had to drink all of it. GX 1C-196- 99; 162:6-163:19. ▮ then sent a video of exactly that. GX 1D.9; GX 1C-199. Later that same day, the defendant asked ▮ to show him her "booty," and she sent a picture of her rear in which part of her vagina is exposed. GX 1D.10; GX 1C-205; Tr. at 165:11-166:14. Shortly thereafter, the defendant asked ▮ for a nude picture of herself "from the side standing up...in a mirror", and she sent an image of her bare side exposing her side rear. GX 1D.11; GX 1C-206; Tr. at 166:15-167:10.

On January 23, 2017, the defendant said that he was horny and needed help, and ▮ sent a video of herself undressing to fully nude and then rubbing her vagina. GX 1D.13; GX 1C-282; Tr. at 169:8-170:11. Later that day, after a conversation during which the defendant instructed ▮ to masturbate and the two discussed urinating, urinating on each other, and using various drugs, ▮ sent a video of herself urinating in which her vagina is exposed. 1D.15; GX 1C-287-92.

On January 24, 2017, as part of an explicit sexual conversation where the two role played, ▮ was a younger child, and the defendant said to suck on his "d**k . . . like its a lollypop," ▮ sent a "present," which is a video of herself masturbating. GX 1D.20; GX 1C-319-22; Tr. at 174:3-175:12. In total, ▮ sent, at the defendant's request, more than a dozen sexually explicit videos and photographs. See GX 1D.1-1D.4, 1D.9-1D.20.

    iii. ▮

Between January and February 2017, the defendant used the Jay Stern Facebook Account to communicate with ▮ who was 14 years old. GX 1E; PSR at ¶ 19; Tr. 260:1-7. ▮ testified that she was initially a little wary of the defendant, but through their conversations he made her feel comfortable. Tr. at 261:18-24. She trusted him and felt like he cared about her. Id. She described some of the things they talked about as sexually bizarre, and she recalled taking sexually explicit photographs for the defendant because he asked for them and because she wanted to impress him. Tr. at 262:14-21, 264:24-265:2.

On January 24, 2017, the defendant contacted ▮ and ▮ asked the defendant if he minded being a pedophile. The defendant responded, "no...i mean, i guess by definition...but i go for maturity over age." GX 1E-001-02. That very first day, the defendant promised he would come visit ▮ and began asking her about sex, drugs, her "deepest darkest secrets," and her "fantasies, fetishes, or kinks." GX 1E-002-03, -06-09, -12. The defendant told 14-year-old ▮ that he loved "big age gaps" and asked if she was "into incest." GX 1E-011-12. He further told her he loved girls in leather, younger girls,

5

"anything taboo," "risky sex," and "preteen emo[.]" GX 1E-012-13. After ▇ disclosed that she was more than 250 pounds, the defendant attempted to groom her with flattery, saying that he "love[d] bigger girls" (GX 1E-013-14) and that ▇ was "perfect" (GX 1E-014).

On January 26, 2017, the defendant said that he was "waiting on a sexy pic[ture] of [▇ and ▇ sent the defendant two images: one where her bare chest was exposed (GX 1E-040; GX 1F.1) and another where she was fully nude (GX 1E-042; GX 1F.2). The defendant told ▇ he was in love with her. GX 1E-053. He told her he was rich (his parents were "multi-multi-millionaires") and that he wanted to buy her things and spoil her. GX 1E-071-71; Tr. at 262:2-5. ▇ told the defendant how happy she was because she wouldn't "have to wear hamidowns from [her] mom" again. GX 1E-082; see also GX 1E-089. Shortly thereafter, the defendant asked ▇ to film herself having sex with a dog. GX 1E-084-85.

On February 16, 2017, the defendant sent ▇ images of a male, who he represented was himself. GX 1E-136. Thereafter, ▇ sent the defendant an image that the defendant previously had sent her, purportedly of himself, which was obviously a different person than the one in the more recent photo, and she accused the defendant of lying to her. GX 1E-137-42. The defendant became angry with ▇ saying "go f**k yourself if you think im lying to you," and ▇ became upset, apologized, said "im not leaving cuz i love you for who u are" and asked the defendant not to leave her. GX 1E-142-43; Tr. 262:22-263:4. The next day, on February 17, 2017, the defendant asked ▇ as if she owed him something after their fight—to "cheer [him] up." GX 1E-145. ▇ testified that she knew "exactly" what the defendant meant. Tr. 273:1-274:4. And in response, ▇ sent the defendant an image of herself in the mirror exposing her backside and vaginal area. GX1F.3; GX 1E-145. The defendant responded, "keep going," and, as ▇ testified, she did just that. GX 1E-145; Tr. 273:2-5. And a few days later, ▇ sent the defendant a picture of her vagina. GX 1F.4; GX 1E-157; Tr. at 265:23-266:2.

iv. ▇

In May 2017, the defendant used the Sam Morgan Facebook Account to communicate with 10-year-old ▇ PSR ¶ 20. When he was using that account, the defendant pretended to be a 14-year-old boy. Id.; GX2B-028; GX 2A.7 (examples of defendant sharing pictures of teenage boy that he used when pretending to be "Sam Morgan"). Using this teenage persona, the defendant asked 10-year-old ▇ if she would date him (the teenage "Sam Morgan"). GX 2B-027. ▇ immediately agreed. GX 2B-027. He told ▇ he wanted to kiss her, that he wanted to "do more then [sic] kiss," and that she was "hot." GX 2B-026. When ▇ told the defendant that she was "small," the defendant responded that he loved "small," and that his "ex was younger then [sic] [her], so im used 2 it[.]" GX 2B-021-022. And when the defendant asked ▇ "whats the oldest ud date?", she responded "14-16[.]" GX 2B-018. The defendant also revealed his true fantasy when he told her that his "bro," who the defendant separately indicated was "older," "wants 2 know if he brings me 2 see u, can he fuck u 1 time?"

6

███████ responded, "lets not do that on my birthday plz can we just be regular emo bf gf[.]" GX 2B-015. During the course of these communications, ███████ sent numerous pictures of herself in which it was obvious that she was very young. GX 2B-020, -024, -025. Ultimately, the defendant asked her for a "full body pic," saying that he wanted to see his "adorable tiny girlfriend." GX 2B-008. In response, ███████ sent him a fully nude photograph of herself, in which she is leaning forward into the camera and cupping her barely developed breasts. GX 2B-007. The defendant responded, "mmmm[.]" Id.

    C. The Defendant's Arrest and Charges

On September 17, 2018, a grand jury sitting in the Eastern District of New York returned a five-count indictment, charging the defendant with sexual exploitation of a minor, in violation of 18 U.S.C. §§ 2251(a) and (e). ECF No. 1. The defendant was arrested in connection with the federal indictment on September 19, 2018. PSR ¶ 21. On July 11, 2020, a grand jury sitting in the Eastern District of New York returned a superseding indictment charging the defendant with eleven counts—four counts of sexually exploiting a minor and six counts of attempting to sexually exploit a minor, in violation of Title 18, United States Code, §§ 2251(a) and (e). ECF No. 73. Jury selection commenced on June 6, 2022, followed immediately by trial. Three of the four victims identified in the superseding indictment—███████ ███████ and ███████ testified at trial. The government also presented to the jury, among other evidence, the defendant's chats with all four victims, as well as sexually explicit images and videos of each victim. On June 14, 2022, the jury returned a verdict convicting the defendant of four counts of sexually exploiting a minor and five counts of attempting to sexually exploit a minor. ECF No. 154. The jury acquitted on one count of attempting to sexually exploit a minor. Id.

    II.    Guidelines Calculation

The government agrees with the Guidelines calculation set forth by the United States Probation Department ("Probation") in the PSR and the PSR Addendum, which calculation is reflected below:

Counts 1 and 2 (Sexual Exploitation of ███████)

| | |
|---|---:|
| Base Offense Level (§2G2.1(a)) | 32 |
| Plus: minor at least 12 but less than 16 years old (§ 2G2.1(b)(1)(B)) | +2 |
| Plus: defendant misrepresented identity and used computer (§ 2G2.1(b)(6)) | +2 |
| Plus: vulnerable victim (§ 3A1.1(b)(1)) | +2 |
| Total: | 38 |

7

Counts 3 and 4 (Sexual Exploitation of ███)

|  |  |
|---|---|
| Base Offense Level (§2G2.1(a)) | 32 |
| Plus: defendant misrepresented identity and used computer (§ 2G2.1(b)(6)) | +2 |
| Plus: vulnerable victim (§ 3A1.1(b)(1)) | +2 |
| Total: | 36 |

Count 5 (Attempted Sexual Exploitation of ███)

|  |  |
|---|---|
| Base Offense Level (§2G2.1(a)) | 32 |
| Plus: defendant misrepresented identity and used computer (§ 2G2.1(b)(6)) | +2 |
| Plus: vulnerable victim (§ 3A1.1(b)(1)) | +2 |
| Total: | 36 |

Count 6 (Attempted Sexual Exploitation of ███)

|  |  |
|---|---|
| Base Offense Level (§2G2.1(a)) | 32 |
| Plus: defendant misrepresented identity and used computer (§ 2G2.1(b)(6)) | +2 |
| Plus: vulnerable victim (§ 3A1.1(b)(1)) | +2 |
| Total: | 36 |

Counts 8 and 9 (Sexual Exploitation of ███)

|  |  |
|---|---|
| Base Offense Level (§2G2.1(a)) | 32 |
| Plus: minor at least 12 but less than 16 years old (§ 2G2.1(b)(1)(B)) | +2 |
| Plus: defendant misrepresented identity and used computer (§ 2G2.1(b)(6)) | +2 |
| Plus: vulnerable victim (§ 3A1.1(b)(1)) | +2 |
| Total: | 38 |

Counts 10 and 11 (Sexual Exploitation of ███)

|  |  |
|---|---|
| Base Offense Level (§2G2.1(a)) | 32 |
| Plus: minor had not attained the age of 12 years old (§ 2G2.1(b)(1)(A)) | +4 |

8

| | |
|---|---:|
| Plus:  defendant misrepresented identity and used computer (§ 2G2.1(b)(6)) | +2 |
| Plus:  vulnerable victim (§ 3A1.1(b)(1)) | <u>+2</u> |
| Total: | <u>40</u> |
| <u>Greater of the Adjusted Offense Levels Above</u>: | 40 |
| <u>Multiple Count Adjustment (§ 3D1.4)</u>: | +5 |
| <u>Repeat Dangerous Sex Offender Against Minors (§ 4B1.5(b)(1))</u> | <u>+5</u> |
| <u>Total</u> | 50 |
| **Final Total Offense Level**:[2] | <u>**43**</u> |

PSR at ¶¶ 29-74, PSR Addendum at ¶¶ 72-74.

Given this offense level and a Criminal History Category of I, the applicable Guidelines range is life imprisonment.  The statutorily authorized maximum term, however, is 3,600 months, or 300 years, which is less than the minimum of the Guidelines range, so the restricted Guideline term is 300 years.  The defendant is also subject to a statutory minimum term of imprisonment of 15 years on each count, and a statutory maximum term of imprisonment of 30 years on each court. 18 U.S.C. § 2551(e).

      III.     <u>The Defendant Should Be Sentenced to 35 Years in Prison</u>

For the reasons set forth below, the government respectfully submits that the defendant should be sentenced to a term of custody of 35 years.

    A.  <u>Legal Standard</u>

In <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines were no longer mandatory, but should be considered in conjunction with the factors outlined in § 3553(a).  Thereafter, the Supreme Court confirmed that § 3553(a) requires a sentencing court to give respectful consideration to the Guidelines, but <u>Booker</u> allows the court to "tailor the sentence in light of other statutory concerns[.]"  <u>Kimbrough v. United States</u>, 552 U.S. 85, 101 (2007) (citing <u>Booker</u> at 245-46 and <u>Gall v. United States</u>, 552 U.S. 38, 46-49 (2007)).  However, the Supreme Court explained that even though the Guidelines are now advisory, "district courts must treat the Guidelines as the 'starting point and the initial benchmark'" when determining a defendant's sentence.  <u>Kimbrough</u> at 108 (citing <u>Gall</u> at 50 and <u>Rita v. United States</u>, 168 L. Ed. 203, 213 (2007)).

---

[2]    Pursuant to Chapter 5, Part A (comment n.2), where the total offense level is calculated in excess of 43, the offense level will be treated as a level 43.

9

With the Guidelines as the "starting point and the initial benchmark," the Court should next consider the factors set forth by Congress in § 3553(a). Id. That statute provides that a Court should consider a number of factors when determining a defendant's sentence, including:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and
>
> (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. §§ 3553(a)(1) and (2).

As set forth below, in connection with the analysis of the § 3553(a) factors, the nature and circumstances of the offense—which to date the defendant has not accepted responsibility for—in conjunction with the need to deter both the defendant and others from engaging in the selfish and destructive conduct such as that here, which targeted the most vulnerable members of the community, overwhelmingly weighs in favor of a substantial sentence for this particular defendant, whose history and characteristics should have lead him away from such egregious conduct but instead formed the basis for his predatory tactics.

B. Analysis

Here, pursuant to Supreme Court precedent, the Court's "starting point and the initial benchmark" when determining the defendant's sentence should be the Guidelines range of life imprisonment, but no more than 300 years. Kimbrough at 108 (citing Gall at 50 and Rita v. United States, 168 L. Ed. 203, 213 (2007)). In light of the sentencing factors set forth by Congress in § 3553(a), the government respectfully submits that a sentence of 35 years in prison is warranted in this case.

As an initial matter, with respect to § 3553(a)(1), sexually exploiting children is among the most serious of crimes. The immediate and long-term damage caused to victims of such conduct is hard to comprehend. The defendant's crimes are particularly heinous. The defendant created social media accounts for the sole purpose of grooming and exploiting young children. On one of those accounts—the Sam Morgan Facebook Account—he posed as a teenage boy in order to gain access to even younger children. His victims were as young as 10-years-old. Additionally, the evidence showed that the defendant conversed online with hundreds of children, a far greater number than the four who were the subject of the Superseding Indictment.

Notably, the defendant actively sought out children who he knew would be particularly vulnerable, searching for LGBTQ+ children who were more likely to be in need

of acceptance and love. The defendant homed in on each child's insecurities, like Kyra's weight and Octavia's struggle with gender identity. And he masterfully manipulated them, expressing fake love and support to draw them in; criticizing them for failing to be "open minded" if they expressed discomfort speaking sexually with an adult; and exposing them to extreme sexual content, including discussions about leather, sexual urination, sex with very young children and babies, little kids taking hardcore drugs, bestiality, "gangbangs" and group sex. Some of these conversations went on for months, and the defendant developed relationships, as a result of which the victims actually believed that they were dating the defendant, who might come and visit them one day. The defendant pushed these young children to engage in sex chats with him and made them feel as though they had to engage in more and more extreme sexual conversations and provide him with sexually explicit photographs to keep his attention, "love" and affection. The materials he caused these children to create ranged from a fully nude photograph of a 10-year-old girl (███████) to a video of a sixteen-year-old girl (████ urinating into a cup and drinking it. In one of the more disturbing chats presented at trial, the defendant wrote to 16-year-old ████ "maybe we make a deal…video of you peeing into a cup, then drinking it." GX 1C-198. He went on to write, "I wanna see the pee coming out, into the cup, and then you drinking it." GX 1C-198. When ████ asked if she had to drink all of it, indicating that she did not like it, the defendant told her that she had to drink it all. GX 1C-199. As shown in the video presented at trial, ████ did exactly what the defendant directed her to do. GX 1D.9; GX 1C-199. The defendant exploited, degraded and abused these young children for his own selfish reasons, and he continues to show no regard for the damage he caused.

The defendant's history and characteristics also weigh in favor of a substantial sentence. First, the defendant was a teacher, and yet he is every parent's worst nightmare: a predator hiding in plain sight. The defendant's perceived normalcy and kindness in his capacity as a teacher is part of what makes him so dangerous. He was a mandatory reporter of child abuse, i.e., the defendant promised to protect children, to look out for their best interest and to defend them from pedophiles like himself. Instead of upholding that standard and fulfilling his role as an educator, the defendant used the knowledge he acquired through interacting with children to develop his grooming skills and ultimately sexually exploit vulnerable children. For example, in the chat messages with the victims, the defendant demonstrated a knowledge of music, gender identity issues, clothing and trends that a typical adult, who did not have regular access to children, would not have. Moreover, as someone familiar with teenagers, the defendant was a master of drawing out and identifying each victims' respective insecurities, which enabled him to draw them closer, capitalize on their desire for acceptance and then entice them to give him what he wanted out of the relationship, child exploitative images and videos made just for him.

The investigation further revealed that the defendant's attraction to minors permeated his teaching career. Indeed, at least two of his students, who were interviewed by the FBI, expressed discomfort in the way that he treated and communicated with them, in particular as a result of the fact that he engaged them on sexual topics. One student ("Student 1") relayed that, shortly after graduation, the defendant contacted her directly and asked her on a date, which made her feel "terrified." Similar to the children online, the

11

defendant told Student 1 that when he saw her in tenth grade, he thought she was the most beautiful girl he had ever seen. Another student ("Student 2") reported to the FBI that as a teacher, the defendant would often make sexual jokes, and similarly told Student 2 that she was the most beautiful girl he had ever seen. After graduation, the defendant went on a date with Student 2, disclosed his sexual preferences, directed her to use an encrypted application, Signal, to communicate with him, and invited her to sext with him. Similarly, Facebook records established that, in November 2017, the defendant engaged in yet another relationship with a former student ("Student 3"), a male who self-described as "a crossdresser AND half [the defendant's] age." As part of that conversation, the defendant asked Student 3 to be discreet, saying "just gonna ask a favor for now...since there is still some taboo about this, especially in my profession, just between us for now?" At the time, i.e., in November 2017, the defendant was simultaneously chatting online with numerous minors, including ██████ and ██████ And although the investigation did not reveal evidence that the defendant sexually exploited any minor students, it is clear that he demonstrated a sexual interest in them, caused them discomfort and even began grooming them before they had reached a legal age.

Relatedly, these characteristics of the defendant—his compulsive grooming behavior, his attraction to minors, and his talent for manipulation—are also born out in the statements that the defendant made to Dr. N.G. Berrill, the expert hired by the government to prepare a psychiatric report, on consent, regarding the danger that the defendant represents to the community, for consideration in 2019 bail proceeding. See PSR at ¶¶ 95-96. During that interview, the defendant told Dr. Berrill that when he was talking to children online, when he would masturbate to his conversations with adolescents, it felt as though he was in a "trance." Berrill Report at 7. Regarding former students, the defendant admitted that pursued relationships with them after graduation, and it was Dr. Berrill's judgement that, at the time, the defendant did not "grasp the inappropriate nature of his contact with his former student." Id. Importantly, Dr. Berrill estimated that:

> With respect to considering the damage (emotionally and psychologically) that was done to his victims by his engaging adolescents in both sex talk and sex acts online, Mr. Deutsch indicated that he knows that what he did was wrong but he found it difficult to articulate a sense of empathy or to speculate on the long-term psychological repercussions that his activities might have on his victims.

Id. at 8. Moreover, at the subsequent public hearing, Dr. Berrill opined that the defendant's failure to "grasp the potential impact of his behavior on these kids" and the defendant's "manipulation" of kids distinguished him from other individuals charged with production. Oct. 24, 2019 Tr. at 11:7-17. Moreover, in the context of these evaluations, the defendant admitted that even after he entered treatment, in the wake of his December 29, 2017 state arrest, the defendant continued to seek out former students and even met one of them, who was 18 years old at the time. These admissions are consistent with the statements of Student 2.

12

With respect to history and characteristics, the government anticipates that the defendant will rely heavily on his lack of criminal history and the supportive nature of his undeniably loving family. Primarily, the vast majority of federal child pornography offenders have no prior records at the time that they are sentenced.[3] This puts the defendant squarely in the heartland of most sex offenders in federal court. Moreover, any mitigating value attributable to the fact that the defendant had never been caught prior to the instance case, is outweighed by the fact that his conduct here was not a one-time event. It was not even a multiple-time event with a single victim. This defendant exploited multiple children, some as young as ten years old, on multiple occasions and over an extended period of time. His protracted behavior was the product of considerable planning and daily, if not hourly, conscious decisions to manipulate and victimize children. Notwithstanding a lack of criminal history, this was not an isolated event.

Additionally, although the defendant does have a supportive family and benefited from a healthy, violence and abusive-free upbringing, these stabilizing and normalizing forces—which the government anticipates he will rely on at sentencing—were already present in the defendant's life when he committed the crimes of which he now stands convicted. Indeed, when the defendant was sexually exploiting children online, he was fully employed, living in a multi-bedroom Brooklyn apartment that he conveniently inherited from his parents, filled with expensive electronics. The defendant was college educated, had a master's degree and was well-traveled. In other words, the defendant was raised with every benefit of an upper middle-class life, free from abuse, and he still chose a life of sexually abusing others. As a result, to the extent that a lack of criminal history and supportive family should be considered as part of his sentence, these factors actually weigh in favor of a substantial sentence.

Consideration of Section 3553(a)(2), the need for the sentence imposed to reflect the seriousness of the offense, provide just punishment for the defendant and promote respect for the law, likewise weighs in favor of a substantial sentence. As previously noted, the defendant's conduct was deliberate, compulsive, pervasive and affected a wide range of children. To the extent the defendant argues at sentencing, as he has in the past, that online sexual exploitation is somehow less culpable or less serious than physical sexual exploitation, this Court should reject that argument. As evidenced by the testimony at trial, and as the government anticipates the victim impact statements as sentencing will show, the most damaging aspect of child exploitation is the mental and psychological manipulation of a child to create harmful images and videos. The victims in this case are now acutely aware of the way in which they were manipulated by the defendant, who they thought was someone else. They are further aware that they were lured by him into a false sense of security, and then as a result of his actions, they themselves created sexually explicit material for him. For victims to live with the knowledge that they participated—albeit as a result of masterful

---

[3] U.S. Sentencing Commission, Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System 320 (2011) available at http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Mandatory_Minimum_Penalties/20111031_RtC_Mandatory_Minimum.cfm.

manipulation and grooming—in their own victimization is what makes this type of child exploitation, commonly referred to as production, so harmful to the actual victims. And the fact remains the same that once these images and videos are produced, regardless of whether a contact offense has occurred or not, they exist in perpetuity.

   Similarly, the need for the sentence imposed to promote respect for the law, provide just punishment to the defendant and promote general and specific deterrence, likewise supports a substantial sentence. Here, the defendant disguised his identity and used Facebook, a social media application frequented by minors, to gain access to children and child exploitation material. Today, there are countless applications that can and are used by pedophiles to engage in the very same crimes as those committed by the defendant. The pool of vulnerable minors on these applications grows larger everyday as children increasingly access and use the internet. Indeed, in a report published in 2021, the United States Sentencing Commission observed that "a growing proportion of production offenders exploit victims remotely through the use of the internet and mobile devices."[4] According to the same report, "the expansion of digital and mobile technology has contributed to a 422 percent increase in the number of production offenders sentenced over a 15-year period, from 98 offenders in fiscal year 2005 to 512 offenders in fiscal year 2019." Id. at 3. In light of the increasing frequency at which these crimes are being committed, it is important for the public to be aware that predators like the defendant seek out victims in this arena, and for people like the defendant to understand that their crimes—which are just as harmful as hands-on sexual offenses—will be punished commensurate with their seriousness. Thus, a lengthy sentence in this case would send a strong message to those, both domestically and abroad, who seek to sexually exploit children online, that the courts will not tolerate the sexual abuse of children and that the consequences for such criminal conduct will be significant.

   Finally, a sentence of 35 years' incarceration is consistent with the sentences imposed in this district and on a national level in comparable cases. Indeed, according to the Child Pornography Production Report, based on a review of federal sentences imposed in 2019, the average sentence for offenders who sexually exploited minors was 275 months' incarceration, and the average sentence for offenders who engaged in remote production as the defendant did here, was 234 months' incarceration (id. at 50.). The Commission also found that courts imposed longer than average sentences when various factors were present in a case, many of which are also present in the defendant's case, including: victims engaged in sexual contact alone, including self-contact id. at 47; the defendant's use of coercive tactics and enticements, id. at 48; the defendant's misrepresentation of his identity to commit

---

[4]  United States Sentencing Commission (2021), Federal Sentencing of Child Pornography: Production Offenses, at 1, 35, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20211013_Production-CP.pdf (the "Child Pornography Production Report") ("For example, over one-third (35.4%) of production offenders sentenced in fiscal year 2019 were internet strangers who met their victims through an online platform, more than double the proportion of offenders sentenced in fiscal year 2010 who met their victims online (14.3%)).

the offense, id.; and the defendant's pattern of sexual exploitation of children, id. at 50.  Such a sentence is also consistent with sentences in this district.  For example, on March 2, 2022, in United States v. Caroleo, the defendant, who pleaded guilty just prior to trial, was sentenced to 30 years' incarceration in connection with his conviction for the online sexual exploitation of a minor.  No. 17-CR-177 (S-1) (ENV).  In that case, the defendant, who had a demonstrated history of physical and emotional trauma, caused a 14-year-old girl to produce sexually explicit images of herself, and to send those images to him using the Kik application.  Caroleo also requested similarly sexually explicit photos of other minors online.  And on October 14, 2022, in United States v. Torres Rivas, the defendant, who pleaded guilty prior to trial, was sentenced to 25 years' incarceration in connection with his conviction for the online sexual exploitation of a minor.  No. 20-CR-494 (GRB).  In that case, the defendant targeted multiple minor females on Snapchat, including a 13-year-old, and like the defendant here, described to her how he had previously had sexual relations with a 9-year-old, in an effort to groom her to create sexually explicit images of herself, which she did.  And unlike the defendants in Caroleo and Torres Rivas, who both pleaded guilty in advance of trial, this defendant has never accepted responsibility for his conduct or shown any remorse whatsoever for his actions.  See also United States v. Weiss, No. 21-CR-449 (PMH) (S.D.N.Y. Nov. 15, 2022) (imposing 25 year sentence in case where defendant pleaded guilty to enticement but engaged in the sexual exploitation of numerous young teens through the use of Snapchat).

      IV.    Conclusion

Although the defendant is a first-time offender, he was a teacher to whom society entrusted children for the purposes of education and care.  Instead, he was an imposter, and he used that role to his advantage when victimizing children.  There is nothing in the defendant's background that justifies or explains his horrific crimes, for which he has not accepted responsibility.  For these reasons, and to protect the public from further crimes

of this defendant, the government respectfully submits that a sentence of 35 years' incarceration, to be followed by a lengthy term of supervision, is appropriate in this case.

                Respectfully submitted,

                BREON PEACE
                United States Attorney

By:       /s/
                Megan E. Farrell
                Rachel A. Shanies
                Assistant U.S. Attorneys
                (631) 715-7862/(718) 254-6140

cc:   Clerk of the Court (FB) (by ECF)
      Counsel for the defendant (by ECF)
      Erica T. Vest, Probation Department (by email)